# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ORACLE CORPORATION DERIVATIVE LITIGATION ) C.A. No. 2017-0337-SG
)

## MEMORANDUM OPINION

Date Submitted: January 25, 2018
Date Decided: March 19, 2018

Joel Friedlander, Jeffrey M. Gorris, and Christopher P. Quinn, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron, David T. Wissbroecker, and David Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Brian J. Robbins, Stephen J. Oddo, and Gregory Del Gaizo, of ROBBINS ARROYO LLP, *Attorneys for Plaintiff Firemen's Retirement System of St. Louis.*

Elena C. Norman, Nicholas J. Rohrer, and Benjamin M. Potts, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly and Rachel J. Rodriguez, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants Lawrence J. Ellison, Safra A. Catz, Mark V. Hurd, Jeffrey O. Henley, Michael J. Boskin, Jeffrey S. Berg, Hector Garcia-Molina, Naomi O. Seligman, George H. Conrades, Bruce R. Chizen, Leon F. Panetta, Renée J. James, and H. Raymond Bingham.*

Thomas A. Beck, Blake Rohrbacher, and Susan M. Hannigan, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Oracle Corporation*.

GLASSCOCK, Vice Chancellor

This matter involves self-dealing by the cofounder/largest blockholder/director (Lawrence J. Ellison) of a well-known tech company (Oracle Corporation), allegedly in breach of fiduciary duties. According to the Complaint, Ellison had founded and retained a significant interest in another tech company, NetSuite, Inc. Recently, Oracle and NetSuite had been competing in the same arena, involving cloud-based services. Oracle was outcompeting NetSuite, and Ellison accordingly viewed an acquisition of NetSuite by Oracle as the best way to preserve his investment in the latter. The Complaint alleges that he and his allies at Oracle engineered a purchase by Oracle at an unfair price.

The Plaintiff is an Oracle stockholder that seeks to bring this action derivatively on behalf of the company. The potential suit, a chose in action, is an asset of Oracle. Under our model of corporate governance, the directors of the company decide how and when to deploy such assets. Accordingly, Court of Chancery Rule 23.1 requires stockholders seeking to obtain action by the directors to make a demand, stating the action sought. Here, however, the Plaintiff alleges that the directors are unable to bring their business judgment to bear on the issue, and that demand would thus be futile; accordingly, it seeks a determination that demand is excused under the Rule, and permission to proceed derivatively.

A court must be wary of permitting stockholders, rather than directors, to control litigation assets of the company. The directors are generally in the best

position to determine if pursuit of litigation is in the corporate interest. An improvident derivative litigation can be disruptive and distracting, at best. Where, however, the directors are disabled (by self-interest, lack of independence, or potential liability in the action itself) from acting in the corporate interest, derivative litigation can be value-adding to the corporation, and may be the only way the litigation asset can be usefully employed. In the unusual case where the plaintiff can plead specific facts leading to a reasonable doubt that the directors are able to exercise business judgment, therefore, demand is excused under Rule 23.1, and the litigation (to the extent the complaint otherwise states a claim) may proceed derivatively. In my view, this is such a case.

The Plaintiff, seeking to demonstrate that demand should be excused, first points to the potential liability of the outside directors, particularly those serving on a special committee appointed to evaluate the conflicted transaction, as well as those on a standing conflicts committee tasked with evaluating transactions involving Ellison. Adding those directors to Ellison and the others who were conflicted with respect to the challenged transaction, the Plaintiff alleges that a majority of the board cannot evaluate a demand in the interests of the company. However, the directors here, unsurprisingly, are exculpated from liability, save for breaches of the duty of loyalty. After having examined the allegations of the Complaint, together with all reasonable inferences therefrom in the Plaintiff's favor, I find that the Plaintiff has

2

failed to demonstrate a reasonable likelihood of liability on the part of a majority of the directors, sufficient to demonstrate that demand should be excused on that ground.

Next, the Plaintiff points to various relationships, business and personal, between a majority of the directors and Ellison. Again, together with the directors interested in the transaction, the Plaintiff contends a majority of the board is incapable of evaluating whether to sue Ellison, in the interests of Oracle. This to me is a closer question. Tangential, non-material business ties among parties are insufficient to demonstrate lack of independence, as are casual social relationships. Here, however, the ties are substantial. Examining each allegedly non-independent director on the particular facts pertinent to her, as I must, I conclude there is reasonable doubt that a majority of the board that would have considered a demand would be capable of bringing its business judgment to bear. Therefore, I find demand excused under Rule 23.1.

My reasoning follows.

# I. BACKGROUND[1]

## A. Parties and Relevant Non-Parties

Nominal Defendant Oracle Corporation is a Delaware corporation headquartered in Redwood City, California.[2] Oracle is a technology company that provides "an integrated array of applications, servers, storage, and cloud technologies to serve modern businesses."[3] Oracle's market capitalization exceeds $200 billion, and it has over 135,000 full-time employees.[4]

Defendant Lawrence J. Ellison cofounded Oracle in 1977 and was its CEO until September 2014, when he became Chairman of the Board and Chief Technology Officer.[5] According to the Plaintiff, Ellison holds 28% of Oracle's common stock,[6] though the Defendants point to an SEC filing that shows that before the Complaint was filed, Ellison had decreased his holdings to about 27%.[7] In 2016, Ellison received $41,518,534 in compensation from Oracle, and he was a member of the Board when Oracle bought NetSuite, Inc.[8] As of September 30, 2016, Ellison held 39.2% of NetSuite's common stock through NetSuite Restricted Holdings

---

[1] The facts, drawn from the Plaintiff's Complaint and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[2] Compl. ¶ 13.
[3] *Id.*
[4] *Id.*
[5] *Id.* ¶¶ 15, 28.
[6] *Id.* ¶ 2.
[7] DiTomo Aff. Ex. C.
[8] Compl. ¶¶ 14–15.

LLC.[9]   Ellison and his affiliates beneficially owned about 44.8% of NetSuite's common stock through trusts and related entities.[10]

Defendant Safra A. Catz has served as Oracle's co-CEO since September 2014, and she was a member of Oracle's Board when Oracle acquired NetSuite.[11] Catz began working at Oracle in 1999, and in 2016 she received $40,943,812 in compensation from the company.[12]

Defendant Mark V. Hurd has served with Catz as Oracle's co-CEO since September 2014.[13]   Hurd was a member of the Oracle Board when it bought NetSuite.[14]   He was also Oracle's President from September 2010 to September 2014, and he received $41,121,896 in compensation from the company in 2016.[15]

Defendant Jeffrey O. Henley has served as Oracle's Executive Vice Chairman of the Board since September 2014.[16]   He chaired the Oracle Board from January 2004 to September 2014, and he was Executive Vice President and CFO from March 1991 to July 2004.[17]   Oracle paid Henley $3,794,766 in compensation in 2016.[18]

---

[9] *Id.* ¶ 15.
[10] *Id.*
[11] *Id.* ¶¶ 14, 16.
[12] *Id.* ¶ 16.
[13] *Id.* ¶ 17.
[14] *Id.* ¶ 14.
[15] *Id.* ¶ 17.
[16] *Id.* ¶ 18.
[17] *Id.*
[18] *Id.*

Defendant George H. Conrades has been an Oracle director since January 2008, and he served on the Special Committee formed in connection with the company's acquisition of NetSuite.[19]  In 2016, Conrades received $468,645 in compensation from Oracle.[20]

Defendant Renée J. James has served on the Oracle Board since December 2015, and she chaired the Special Committee just mentioned.[21]  Oracle paid James $548,005 in compensation in 2016.[22]

Defendant Leon E. Panetta has been an Oracle director since January 2015.[23] Panetta served on the Special Committee that approved Oracle's acquisition of NetSuite, and in 2016 his total compensation from Oracle was $424,681.[24]

Defendant Michael J. Boskin has served on the Oracle Board since April 1994, and in 2016 Oracle paid him $724,092 in compensation.[25]

Defendant Jeffrey S. Berg has served as an Oracle director since February 1997, and he received $512,398 in compensation from the company in 2016.[26]

---

[19] *Id.* ¶ 19.
[20] *Id.*
[21] *Id.* ¶ 20.
[22] *Id.*
[23] *Id.* ¶ 21.
[24] *Id.*
[25] *Id.* ¶ 22.
[26] *Id.* ¶ 23.

6

Defendant Hector Garcia-Molina has served on the Oracle Board since October 2001, and he received $425,645 in compensation from the company in 2016.[27]

Defendant Naomi O. Seligman has been an Oracle director since November 2005.[28] In 2016, she received $440,645 in compensation from the company.[29]

Defendant Bruce R. Chizen has been a member of the Oracle Board since July 2008, and he served as Oracle's Lead Independent Director until at least September 2016.[30] In 2016, Oracle paid Chizen $716,061 in compensation.[31]

Defendant H. Raymond Bingham served on the Oracle Board from November 2002 to March 2017, and in 2016 he received $890,902 in compensation from the company.[32]

Plaintiff Firemen's Retirement System of St. Louis held Oracle stock at the time of the conduct described in the Complaint and has continuously held stock since then.[33]

---

[27] *Id.* ¶ 24.
[28] *Id.* ¶ 25.
[29] *Id.*
[30] *Id.* ¶ 26.
[31] *Id.*
[32] *Id.* ¶ 27.
[33] *Id.* ¶ 12.

*B. Factual Background*

### 1. Ellison's Role at Oracle

As noted above, Ellison cofounded Oracle in 1977.[34] Since then, he has served on Oracle's Board and held various leadership roles at the company.[35] Specifically, from 1977 to September 2014, Ellison served as Oracle's CEO, and from 1995 to 2004, he chaired the Oracle Board.[36] Ellison currently serves as Oracle's Chairman of the Board and Chief Technology Officer.[37] The Plaintiff alleges that despite these changes in title, Ellison has always called the shots at Oracle.[38] In support of this allegation, the Plaintiff relies on several sources, including a biography of Ellison and various news articles. I recount only the most salient descriptions of Ellison's tenure at Oracle.

A biography of Ellison quotes Marc Benioff, a former Oracle executive, as saying that "Larry's like a spiritual guru, and Oracle is like a cult."[39] Defendant Henley, an Oracle director and senior executive, put the point less colorfully in an October 2008 article, stating that "[t]here is no successor to Larry, no heir apparent. . . . Larry still wants total control."[40] Defendant Berg, another Oracle director,

---

[34] *Id.* ¶ 28.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *E.g.*, *id.* ¶¶ 29, 42
[39] *Id.* ¶ 29.
[40] *Id.* ¶ 30 (alterations in original).

8

described Ellison as "the owner of a team who can sit up in a skybox and own the franchise."[41]  And Oracle's former president, Charles Phillips, said that "Larry will be here forever. We don't discuss succession. That's not my job."[42]

To illustrate Ellison's control of Oracle, the Plaintiff describes Ellison's decision to remove Joe Costello from the Board.[43]  Costello fought with Ellison over Ellison's selection of Ronald Wohl to head Oracle's applications division; the two also clashed over Costello's refusal to use Oracle products at the company he ran.[44] Ellison would not tolerate this level of dissent, so he "effectively fired Costello from the Board."[45]  Similarly, in June 2000, Ellison forced Ray Lane, Oracle's then-President and Chief Operating Officer, to resign, citing a desire to have everyone at Oracle understand that "there is one single centralized point of authority, and it will be with the CEO[, that is, Ellison]."[46]

These incidents took place several years ago, and Ellison is no longer Oracle's CEO.  But, according to the Plaintiff, Ellison's domination of Oracle has continued unabated.  As noted above, Ellison stepped down as CEO in September 2014 to become Chief Technology Officer and Chairman of the Board, and Catz and Hurd

---

[41] *Id.* ¶ 34.
[42] *Id.* ¶ 30.
[43] *Id.* ¶ 31.
[44] *Id.*
[45] *Id.*
[46] *Id.* ¶ 32.

became Oracle's co-CEOs.[47] During Oracle's Q1 2015 earnings call, Catz downplayed the significance of this reshuffling of titles, stating that "[t]here will actually be no changes. Okay? Not no significant changes. I just want to clarify. No changes whatsoever."[48] Ellison himself echoed this sentiment: Two weeks after the earnings call, he compared himself to Abraham Lincoln presiding over "his postwar [sic] cabinet, except that on Ellison's cabinet 'we tend to agree on things.'"[49] Oracle analysts and the financial press agreed that the reshuffled titles would not lead to meaningful changes in the company's management.[50]

The Plaintiff charges that Ellison's continuing control of Oracle is evident from his "massive overcompensation" in the face of persistent objections by Oracle's stockholders.[51] According to the Plaintiff, "[s]tockholders have rejected Oracle's pay practices in every annual meeting since at least 2012, making Oracle the only company in the S&P 500 that has failed five straight say-on-pay votes."[52] For example, in 2016, about 83% of the voted shares not held by Ellison expressed disapproval of Oracle's executive compensation arrangements.[53]

---

[47] *Id.* ¶ 36.
[48] *Id.* ¶ 38.
[49] *Id.* ¶ 39.
[50] *Id.* ¶¶ 40–41.
[51] *Id.* ¶ 35.
[52] *Id.*
[53] *Id.*

## 2. Ellison Decides That Oracle Should Buy NetSuite

Ellison cofounded NetSuite in 1998 in order to provide businesses with internet-based management software.[54] Ellison financed NetSuite at its inception, and he remained its largest stockholder until its sale to Oracle, when he and those affiliated with him held about 45% of NetSuite's outstanding stock.[55] As early as 2003, Ellison planned to have Oracle acquire NetSuite if NetSuite proved successful.[56] In fact, NetSuite did quite well, going public in December 2007 at a valuation of about $1.5 billion and achieving annual revenues of $741 million in 2015.[57] NetSuite's success stemmed in large part from its ability to "provide[] cloud-based financial management and Enterprise Resource Planning ("ERP") software suites for medium sized businesses without meaningful competition from large ERP software providers, such as Oracle, SAP and Microsoft."[58]

By 2015, however, NetSuite's prospects had begun to dim. Large ERP software providers had started seriously competing in the cloud-based SaaS ERP market that NetSuite focused on.[59] NetSuite faced increasing competition from Oracle in particular, which had moved into the cloud-based ERP software arena.[60]

---

[54] *Id.* ¶ 43.
[55] *Id.* ¶¶ 43, 51 n.2.
[56] *Id.* ¶ 44.
[57] *Id.* ¶¶ 45–46.
[58] *Id.* ¶ 46.
[59] *Id.* ¶ 47. "SaaS" refers to "software as a service."
[60] *Id.*

11

As a result of these competitive threats, NetSuite's stock price tumbled in 2015 and 2016, dropping from $107.31 per share on January 2, 2015, to $53.11 per share on February 12, 2016.[61]

According to the Plaintiff, the Board knew of Oracle's increasing success vis-à-vis NetSuite. For example, in April 2015, Oracle's Independence Committee, which had reporting obligations to the Board, learned from management that "In Head to Head Competes, Oracle Dominates in the Larger Opportunities Due to Superior Global Functionality," and that "In Next Fiscal Year, Competes will Continue to Rise as Oracle Adds Coverage for Products Industries and Continues to Grow Coverage in Mid-Market."[62] Management prepared another presentation in mid-2015 that concluded that "Since take off [in Q1 2014], [Oracle's] win rates in ERP Cloud are significantly higher against NetSuite than against Other Competitors."[63] The public market also picked up on Oracle's role in NetSuite's declining fortunes. Indeed, in June 2016, Cowen and Company issued an analyst report identifying "O[racle] [a]s the biggest near-term competitive threat [to NetSuite]."[64]

---

[61] *Id.*
[62] *Id.* ¶ 48.
[63] *Id.* ¶ 49 (alterations in original).
[64] *Id.* ¶ 50 (emphasis omitted).

Oracle's success in competing with NetSuite posed a problem for Ellison. As noted above, Ellison was at this time NetSuite's largest stockholder, holding (along with related entities and family members) about 45% of the company's outstanding stock.[65] Ellison's stake in NetSuite would lose value if Oracle continued to outcompete it. So Ellison came up with a solution: have Oracle purchase NetSuite "rather than compete NetSuite's value away."[66] The Plaintiff infers that sometime between mid-2015 and January 2016, Ellison enlisted Oracle management, including Catz and Hurd, to carry out his plan.[67]

### 3. Ellison's Plan Is Executed

The Board first learned of the proposal to acquire NetSuite at a two-day retreat held in January 2016 at Ellison's Porcupine Creek estate.[68] On the second day of the retreat, Catz led a strategy discussion with the Board, during which Douglas Kehring, Oracle's Chief of Staff, gave the Board an overview of a potential acquisition of NetSuite.[69] The entire Board heard this presentation even though, as the Plaintiff points out, Oracle's Independence Committee was tasked with reviewing and approving related-party transactions and assessing any potential conflicts of interest involving Ellison.[70] And Ellison himself sat in on the meeting

---

[65] *Id.* ¶ 51.
[66] *Id.* ¶¶ 51–53.
[67] *Id.* ¶ 53.
[68] *Id.* ¶ 54.
[69] *Id.*
[70] *Id.* ¶ 56.

where the Board first learned of the possibility of purchasing NetSuite, though he did not participate in the discussion.[71] Moreover, the Board did not receive any written materials on the potential acquisition, and there was no discussion of alternatives to the deal or the origin of management's idea to purchase NetSuite.[72] Nor did the Board discuss any potential conflicts of interest created by Ellison's approximately 45% stake in NetSuite.[73]

The Board ultimately told management "to continue to assess the feasibility of pursuing" NetSuite, and it directed Catz and Hurd "to contact NetSuite 'to understand if NetSuite would be willing to receive an indication of interest.'"[74] Yet the Board insisted that Catz and Hurd refrain from discussing price with NetSuite's management.[75]

The Plaintiff takes issue with the Board's decision to give Catz an important role in the acquisition process. According to the Plaintiff, the Board could not have believed in good faith that Catz would serve Oracle's interests rather than Ellison's.[76] Since she began working at Oracle in 1999, Catz's role has allegedly been to carry out Ellison's will.[77] Indeed, Catz herself said that "I came in with absolutely no

---

[71] *Id.* ¶ 57 & n.4.
[72] *Id.* ¶¶ 58–60.
[73] *Id.* ¶ 60.
[74] *Id.* ¶ 61.
[75] *Id.*
[76] *Id.* ¶ 62.
[77] *Id.* ¶ 63.

agenda other than to help Larry. That actually made my job incredibly easy. If Larry wants something done, now it happens because I'm going to check that it has."[78] A 2009 article in *Fortune* described Catz's "real job [a]s making sure the entire organization follows the policies that Larry Ellison sets."[79] Likewise, the *Wall Street Journal* described Catz as the "enforcer, gatekeeper, and de facto operating chief for Oracle's visionary but mercurial CEO [Ellison]."[80] And Catz's role allegedly remained the same after Ellison stepped down as CEO. In April 2015, Catz said that "[i]f Larry left – is it in one of his fancy cars? – I would be in the passenger seat. I've been on record on this."[81]

Less than a week after the Board first discussed the possibility of acquiring NetSuite, Catz reached out to NetSuite's CEO, Zach Nelson.[82] Catz apparently ignored the Board's instruction not to discuss price, because Nelson later described his discussion with Catz "as a loose, pre-due-diligence, exploratory conversation where a price range of $100-$125 was discussed."[83] That price range represented a premium of 42% to 78% above NetSuite's $70.21 per share closing price on January 21, 2016, the day of the conversation.[84]

---

[78] *Id.* ¶ 64.
[79] *Id.* ¶ 66 (emphasis omitted).
[80] *Id.* ¶ 67.
[81] *Id.* ¶ 69 (emphasis omitted).
[82] *Id.* ¶ 71.
[83] *Id.* (emphasis omitted).
[84] *Id.*

The Board next met to discuss the potential acquisition two months later.[85] All directors save Ellison, Henley, Hurd, Bingham, and Seligman attended this meeting.[86] At the meeting, Catz told the Board about her discussion with NetSuite's CEO, though she failed to mention that the two had discussed a price range.[87] The Board then decided to form a Special Committee, to which it delegated "the full and exclusive power of the Board" regarding the potential acquisition.[88] As the Plaintiff puts it, "the Special Committee had the power to establish and direct the process for a potential acquisition of NetSuite, negotiate and document terms with NetSuite, determine whether a transaction with NetSuite was fair, approve or reject a transaction with NetSuite, and effectuate a transaction with NetSuite."[89] The Board also gave the Special Committee the power to "evaluate alternatives to the [acquisition of NetSuite], including alternative acquisition targets and internal development opportunities."[90] The Special Committee further received "the full powers of the Independence Committee . . . for purposes of the potential NetSuite transaction, including expressly the power to make the required determinations under the Independence Committee charter and Oracle's conflict of interest

---

[85] *Id.* ¶ 73.
[86] *Id.*
[87] *Id.* ¶ 74. Indeed, Catz represented to the Board that "no other terms or details relating to any potential transaction with [NetSuite] were discussed." DiTomo Aff. Ex. D, at 1.
[88] Compl. ¶¶ 75–76.
[89] *Id.* ¶ 76.
[90] DiTomo Aff. Ex. D, at 3.

16

policy."[91]  Finally, the Board tasked the Special Committee, which was chaired by James and also included Panetta and Conrades, with "directing 'senior management's involvement in assessing a potential transaction.'"[92]

The Special Committee hired Moelis & Company LLC to provide financial advice in connection with the potential acquisition, and it retained Skadden, Arps, Slate, Meagher & Flom LLP to provide legal advice.[93]  Moelis's engagement letter set out the following fee structure: Moelis would receive $1 million for evaluating a potential transaction with NetSuite, $2 million for issuing an opinion on the fairness of a potential transaction with NetSuite, and $17 million if Oracle closed a transaction with NetSuite.[94]  The evaluation and fairness opinion fees would be offset against the $17 million fee Moelis would receive if Oracle consummated a deal with NetSuite.[95]  The Special Committee "noted that the success fee component would provide the financial advisor with a financial incentive to see a transaction completed and discussed whether there were alternatives to the success fee structure that would best serve [Oracle] and its stockholders."[96]  The Special Committee ultimately concluded that "it would be more advantageous to [Oracle], on balance, were it not obligated to pay a significant fee for financial advisory services unless

---

[91] Compl. ¶ 77.
[92] *Id.* ¶¶ 75, 77, 81.
[93] *Id.* ¶ 79; DiTomo Aff. Ex. E, at 2.
[94] Compl. ¶ 79.
[95] *Id.*
[96] DiTomo Aff. Ex. F, at 2.

17

and until a transaction were completed."[97]  And, in the Special Committee's view, it would probably be unable to obtain a high-quality financial advisor unless it was ready to pay a fee in the ballpark of that proposed by Moelis.[98]

The Special Committee met thirteen times over the following months to consider the potential transaction with NetSuite; Ellison did not attend any of these meetings.[99]  On May 20, 2016, the Special Committee met to decide whether to pursue the NetSuite acquisition.[100]  Moelis and Oracle management gave separate presentations, both of which concluded that NetSuite was a preferable acquisition target to other companies.[101]  Oracle management stated that after engaging in "careful consideration and review of the potential alternatives, including organic alternatives," it had come to think that NetSuite offered "the best strategic fit with Oracle."[102]  Moelis, for its part, said that NetSuite "would complement Oracle's ERP offering and provide a number of benefits, including by allowing Oracle to provide a two-tier ERP solution to its customers."[103]  The Plaintiff alleges that the presentations themselves lacked "non-superficial information to support" the

---

[97] *Id.*

[98] DiTomo Aff. Ex. F, at 2.

[99] Compl. ¶ 83.  Catz attended eleven Special Committee meetings, *id.*, and, as detailed below, provided guidance to the Special Committee as it went through the acquisition process.

[100] *Id.* ¶ 85.

[101] *Id.* ¶¶ 86–87.

[102] DiTomo Aff. Ex. H, at 1.

[103] *Id.* at 2.

conclusion that NetSuite was a preferable acquisition target.[104]  And the Plaintiff

points out that management's rosy view of NetSuite conflicted with the disparaging

assessment it had offered in an April 2015 presentation.[105]  In any event, after

considering the benefits of pursuing a transaction with NetSuite "and other

alternatives that may be available to [Oracle], including the prospects for organic

growth and alternative acquisition candidates," the Special Committee decided that

acquiring NetSuite was in Oracle's best interests.[106]  At the same time, the Special

Committee "determined that it would remain open-minded about potential

alternatives if they were to emerge."[107]

The Special Committee met again one week later, this time to determine the

offer price for NetSuite.[108]  Moelis provided a preliminary financial analysis of

NetSuite, which included "a Selected Public SaaS Companies analysis, a Selected

Precedent Transactions analysis, and a D[iscounted Cash Flow ("DCF")]

analysis."[109]  The SaaS analysis revealed that most of NetSuite's operating statistics,

including its gross margin and EBITDA, fell below Moelis's mean and median

operating statistics.[110]  Nevertheless, the Special Committee's initial proposal of

---

[104] Compl. ¶ 87.
[105] *Id.* ¶ 89.
[106] DiTomo Aff. Ex. H, at 2.
[107] *Id.*
[108] Compl. ¶ 90.
[109] *Id.*
[110] *Id.* ¶ 91.

19

$100 per share suggested "a multiple of 8.8x 2016 revenue and 7.0x 2017 revenue, which exceeded Moelis's median revenue multiples of 8.0x 2016 revenue and 6.2x 2017 revenue, as well as Moelis's mean revenue multiples of 7.9x 2016 revenue and 6.2x 2017 revenue."[111] The precedent transactions analysis showed "median multiples of 9.0x last twelve months ("LTM") revenue and 7.9x next twelve months ("NTM") revenue."[112] Yet the $100 per share initial offer exceeded those multiples as well, "implying a valuation of NetSuite at a multiple of 10.8x NetSuite's LTM revenue and 8.3x its NTM revenue."[113] While Moelis justified this premium on the ground that some of NetSuite's operating statistics were "on the higher end of the range of those statistics for companies used in the Selected Public SaaS Companies and Selected Precedent Transactions," the Plaintiff argues that this was "demonstrably false," at least with respect to the SaaS analysis.[114] Finally, Moelis's

---

[111] *Id.* (emphasis omitted).
[112] *Id.* ¶ 92.
[113] *Id.*
[114] *Id.* ¶¶ 93–94. As to the SaaS analysis, the Plaintiff notes that "NetSuite's 'operating statistics' fell below Moelis's reported medians in 5 out of the 6 categories of operating statistics included in the analysis, with its gross margin and EBITDA margin falling significantly below Moelis's concluded medians, and with just one operating statistic falling at or slightly above the median." *Id.* ¶ 94. And, with respect to the precedent transactions analysis, the Plaintiff concedes that "NetSuite's LTM revenue and NTM revenue growth rate fell at the higher end of the range for companies included in the analysis." *Id.* ¶ 95. But, according to the Plaintiff, many of the companies included in the analysis had achieved profitability, a feat never managed (at least on a GAAP basis) by NetSuite. *Id.* Moreover, in contrast to the acquisition process for NetSuite, an Ellison-controlled entity, "nearly all of the transactions included in the Selected Precedent Transactions analysis involved a competitive bidding process that generated price discovery and premium revenue multiples for the target companies." *Id.*

DCF analysis generated "a range of values per share of $121.21 [to] $181.56."[115] The Plaintiff charges that this analysis was unreliable because it was based on projections prepared by Oracle management, including Catz.[116] Those projections included purportedly unrealistic assumptions, including "that Oracle would transmogrify NetSuite's steadily-declining EBIT margin from 2.4% in the prior twelve months into an unprecedented 21.3% in 2017, and further to a staggering 46.3% in 2021."[117]

As just noted, the Special Committee agreed on an initial offer for NetSuite of $100 per share, a proposal recommended by Catz and other members of Oracle management.[118] NetSuite countered at $125 per share, and when the Special Committee met again on June 8, Oracle management suggested responding with an offer of $106 per share.[119] Management's rationale was that such a price would "provide a clear signal that [Oracle] would not be willing to transact at a price above $110 per share."[120] When management left the meeting, the Special Committee decided to make a counteroffer of $106 per share.[121]

---

[115] *Id.* ¶ 96.
[116] *Id.*
[117] *Id.*
[118] *Id.* ¶ 97.
[119] *Id.* ¶ 98.
[120] DiTomo Aff. Ex. J, at 2.
[121] Compl. ¶ 98. At this meeting, the Special Committee rejected NetSuite's demand that Oracle and Ellison arrange to have Ellison vote his NetSuite stock proportionately with Oracle's other stockholders in the event of a third-party bid that topped Oracle's. DiTomo Aff. Ex. J, at 3–4. The Special Committee did, however, allow Ellison (through his attorney) to negotiate directly with

21

After NetSuite countered at $120 per share, the Special Committee held another meeting.[122] At this June 14 meeting, Oracle management recommended that the Special Committee refrain from immediately responding to NetSuite's latest offer.[123] The Special Committee recognized the risks in this approach, including that NetSuite "may decide to terminate further discussions with the Special Committee."[124] Nevertheless, the Special Committee agreed that it would not make a counteroffer.[125] Two weeks later, NetSuite's financial advisor reached out to Moelis to communicate that NetSuite may have "more flexibility on price than the transactions committee of [NetSuite] was previously willing to show."[126] NetSuite's financial advisor also suggested that "recent market volatility as a result of the vote on Brexit may have created a window of opportunity to come to an agreement on price."[127] At a Special Committee meeting two days after this unsolicited communication, Catz and another member of Oracle management recommended "that the parties should organize a due diligence session to understand [NetSuite's] financial results for the quarter, report that back to the Special Committee, and then

---

NetSuite about such an arrangement. *Id.* at 4. Ellison eventually agreed to proportional voting. Compl. ¶ 104.

[122] Compl. ¶ 99.

[123] *Id.*

[124] DiTomo Aff. Ex. K, at 2.

[125] Compl. ¶ 99.

[126] DiTomo Aff. Ex. L, at 1–2.

[127] *Id.*

determine what steps, if any, to take further."[128]  The Special Committee followed management's recommendation, reasoning that an additional diligence session "would provide a signal . . . that the Special Committee was inclined to continue to be tough on price negotiations should any take place."[129]

On July 6, Oracle management, joined by James and Moelis, held a diligence call with NetSuite's CFO.[130]  Two days later, the Special Committee met, and Catz relayed management's view that "it would want to obtain additional information regarding certain of the financial metrics that [NetSuite] had provided . . . to better understand . . . these metrics and their implications for the business of [NetSuite]."[131]  The Special Committee ultimately approved additional meetings between Oracle management and NetSuite.[132]  Management reported back to the Special Committee at a July 12 meeting, observing that "NetSuite's subscription revenue would likely miss consensus estimates and that NetSuite would be challenged to meet its standalone revenue guidance for the remainder of fiscal year 2016."[133]  These developments led management to prepare (and present to the Special Committee) new DCF ranges that included reduced values for NetSuite.[134]  The new terminal

---

[128] *Id.* at 2.
[129] *Id.*
[130] Compl. ¶ 99.
[131] DiTomo Aff. Ex. M, at 2.
[132] *Id.*
[133] Compl. ¶ 101.
[134] *Id.* ¶ 102.

value multiple range ran from $93.78 to $120.83 per share.[135]  Management also showed the Special Committee slides demonstrating that an acquisition of NetSuite at $106 per share "would be the richest deal Oracle ever engaged in based on expected growth versus revenue multiple."[136]

The next day, July 13, the Special Committee reconvened to discuss NetSuite's latest offer of $111 per share.[137]  Catz and other members of Oracle management presented a new set of valuation ranges, including two sets of projections that did not appear in management's presentation from the day before.[138] Specifically, management now described the terminal value multiple range just discussed as the "Conservative Case," and it added new, higher sets of projections that it labeled the "Base" and "Upside" cases.[139]  The "Base" case showed a valuation range of $110.63 to $141.96 per share, and the "Upside" case implied a range of $120.94 to $159.79.[140]  Management offered these new ranges even though it had not conducted additional due diligence or received any new information since the previous day's presentation.[141]  In any event, after consulting with Moelis, the

---

[135] Quinn Aff. Ex. 6, at ORACLECORP00000623.
[136] Compl. ¶ 102.
[137] *Id.* ¶ 103.
[138] *Id.*
[139] *Id.*
[140] Quinn Aff. Ex. 7, at ORACLECORP00000633.
[141] Compl. ¶ 103.

Special Committee decided to make a "best and final" offer of $109.[142] NetSuite agreed to that price.[143]

On July 27, the Special Committee met to consider whether to approve the NetSuite acquisition.[144] Oracle management, including Catz, gave a presentation on the transaction, as did Moelis.[145] Management provided a "Valuation Summary" containing DCF ranges similar to those included in its July 13 presentation.[146] Moelis's financial analysis resembled its preliminary analysis in containing a selected public SaaS companies analysis, a precedent transactions analysis, and a DCF analysis.[147] The SaaS analysis revealed that the $109 per share transaction price implied revenue multiples for NetSuite that greatly exceeded Moelis's median revenue multiples of 9.8x LTM revenue, 8.3x 2016 revenue, and 6.8x 2017 revenue.[148] Moelis explained this discrepancy by saying that the median revenue multiples were "taken into consideration" given that NetSuite's "operating performance is consistent with the Selected Public SaaS Companies."[149] The

---

[142] DiTomo Aff. Ex. O, at 2.
[143] Compl. ¶ 105.
[144] DiTomo Aff. Ex. P, at 1.
[145] Compl. ¶¶ 105–06.
[146] *Id.* ¶ 105.
[147] *Id.* ¶ 106.
[148] *Id.* ¶ 108. The implied transaction multiples were 11.1x LTM revenue, 9.7x 2016 revenue based on the "Wall Street Consensus," 7.6x 2017 revenue also based on that consensus, 9.7x 2016 revenue based on projections provided by NetSuite's management, and 7.7x 2017 revenue based on those same projections. *Id.*
[149] *Id.*

25

Plaintiff alleges that a similar discrepancy was present in Moelis's precedent transactions analysis.[150]  The Plaintiff further avers that Oracle management manipulated that analysis by understating the LTM revenue of DataLogix Holdings, Inc., one of the companies included in the analysis.[151]  Specifically, management provided Moelis with information about DataLogix that suggested an implied LTM revenue multiple of 11.6x, when in fact the revenue multiple was 9.6x.[152]  That led to a mean LTM revenue multiple that was over 0.1 higher than it otherwise would have been.[153]  According to the Plaintiff, other transactions in the precedents analysis contained inflated revenue multiples as well.[154]  Finally, Moelis's DCF analysis assumed (unreasonably, in the Plaintiff's view) that NetSuite's EBIT margin would increase to at least 22.1% by the second half of 2017, and to as much as 46.5% by 2021.[155]  Those assumptions led to a range of prices from $117 to $211 per share.[156]

Moelis indicated at the July 27 meeting that it was prepared to offer a fairness opinion concluding that the NetSuite acquisition was fair, from a financial point of view, to Oracle.[157]  The Special Committee then approved the acquisition on behalf

---

[150] *Id.* ¶ 109.
[151] *Id.* ¶ 110.
[152] *Id.*
[153] *Id.*
[154] *Id.* ¶ 111.
[155] *Id.* ¶ 112.
[156] *Id.*
[157] DiTomo Aff. Ex. P., at 2–3.

of the Board, and the transaction was announced the next day.[158]  About one month later, T. Rowe Price, which represented clients owning approximately 17.7% of NetSuite's common stock, informed NetSuite's Board that its clients did not plan on tendering their shares at the $109 purchase price.[159]  T. Rowe Price's letter suggested that the $109 price was too low and expressed concern that the pre-due-diligence discussions between Catz and NetSuite's CEO—in which a price range of $100 to $125 per share was discussed—"may have anchored the subsequent discussions."[160]  Oracle responded by extending the offering period to October 6 and then to November 4.[161]  On October 27, T. Rowe Price told the NetSuite Board that its position had not changed, and that it would not support the transaction unless Oracle increased its offer to $133 per share.[162]  T. Rowe Price eventually relented, and on November 5, the transaction closed at $109 per share.[163]

## C. Procedural History

The Plaintiff filed its Complaint on July 18, 2017.  In preparing the Complaint, the Plaintiff relied in part on documents produced in response to a demand made under Section 220 of the Delaware General Corporation Law.  The Plaintiff agreed that any materials produced by Oracle in response to that demand would be

---

[158] Compl. ¶¶ 113–14.
[159] DiTomo Aff. Ex. Q, at 2–3.
[160] *Id.* at 2.
[161] DiTomo Aff. Ex. R, at 2.
[162] DiTomo Aff. Ex. S, at Ex. 1.
[163] Compl. ¶ 114.

incorporated by reference into any complaint involving the subject matter of the demand.[164] Two months before the Plaintiff's Complaint was filed, another Oracle stockholder had filed a separate complaint in this Court challenging the same transaction. On September 7, 2017, this Court designated the Plaintiff's Complaint as the operative pleading. The Complaint contains one count for breach of fiduciary duties against the Defendants.[165] Specifically, the Plaintiff alleges that the Defendants breached their fiduciary duties by pushing for and agreeing to the NetSuite acquisition to benefit Ellison at Oracle's expense.[166] On October 27, 2017, the Defendants moved to dismiss the Complaint in its entirety, and I heard argument on that Motion on January 25, 2018.

## II. ANALYSIS

*A. Rule 23.1*

The Defendants seek dismissal of the Complaint under Court of Chancery Rule 23.1 for failure to make a demand.[167] The demand requirement is an extension of the fundamental principle that "directors, rather than shareholders, manage the business and affairs of the corporation."[168] Directors' control over a corporation

---

[164] DiTomo Aff. Ex. A, ¶ 5.
[165] Compl. ¶¶ 168–72.
[166] *Id.* ¶ 170.
[167] As discussed below, the Defendants have also moved to dismiss under Court of Chancery Rule 12(b)(6).
[168] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

28

embraces the disposition of its assets, including its choses in action.  Thus, under Rule 23.1, a derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[169]  Where, as here, the plaintiff has failed to make a presuit demand on the board, the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[170]  The plaintiff's "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[171]  Under the heightened pleading requirements of Rule 23.1, conclusory "allegations of fact or law not supported by allegations of specific fact may not be taken as true."[172]  In deciding a Rule 23.1 motion, I am limited to "the well-pled allegations of the complaint, documents incorporated into the complaint by reference, and judicially noticed facts."[173]

Here, the Plaintiff challenges the decision to acquire NetSuite, a transaction approved by Oracle's three-member Special Committee.  When the Plaintiff's

---

[169] Ct. Ch. R. 23.1(a).

[170] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Table) (Del. 2015).

[171] *Brehm*, 746 A.2d at 254.

[172] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d 244.

[173] *Breedy-Fryson v. Towne Estates Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *9 (Del. Ch. Feb. 25, 2010).

Complaint was filed, Oracle's Board contained twelve members. Where a derivative plaintiff attacks "a decision approved by a board committee consisting of less than half of the directors who would have considered a demand," the Court applies the *Rules*[174] test for determining demand futility.[175] Thus, *Rules* applies here.

Under *Rules*, a court must "examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations."[176] More specifically, a court must decide whether the plaintiff has alleged particularized facts "creat[ing] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[177] A board is disabled from considering a demand under *Rules* if at least half of its members are interested in the challenged transaction, lack independence, or face a substantial likelihood of personal liability for the conduct described in the complaint.[178] Demand is not excused simply by allegations of director liability, lest the demand requirement be rendered toothless; instead, the plaintiff must "make a

---

[174] *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).
[175] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015).
[176] *Rales*, 634 A.2d at 934.
[177] *Id.*
[178] *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597, at *6 (Del. Ch. Apr. 18, 2017).

threshold showing, through the allegation of particularized facts, that their claims have some merit."[179]

In this case, the Plaintiff argues that demand is futile for several reasons. It alleges that Ellison is an interested director who stood to benefit from an acquisition of NetSuite at an inflated price. Catz, Oracle's co-CEO, purportedly lacks independence from Ellison. And, according to the Plaintiff, at least four other Oracle directors either lack independence or face a serious likelihood of personal liability for their role in the NetSuite acquisition. I first examine whether at least half of Oracle's twelve directors face a substantial likelihood of liability for the conduct described in the Complaint. I then turn to the Plaintiff's allegations about director independence.

### 1. Oracle's Outside Directors Do Not Face a Substantial Likelihood of Liability

Oracle's charter exculpates its directors from monetary liability for breaches of the duty of care.[180] In such a situation, to adequately allege that a director faces a substantial likelihood of liability, the plaintiff must plead a non-exculpated claim against that director.[181] The question, then, is whether the Complaint supports an inference that at least six of Oracle's twelve directors breached the duty of loyalty

---

[179] *Rales*, 634 A.2d at 934.
[180] DiTomo Aff. Ex. U, at 11.
[181] *Baiera*, 119 A.3d at 62–63.

in connection with the NetSuite acquisition. For purposes of conducting the Rule 23.1 analysis, I need not decide whether the four inside directors—Ellison, Catz, Henley, and Hurd—committed a non-exculpated breach of duty. That is because the Plaintiff has failed to offer particularized factual allegations supporting a loyalty claim against any of the eight outside directors.[182] Thus, a majority of the Board does not face a substantial likelihood of liability as to the NetSuite acquisition.

Oracle's eight outside directors do not face a serious prospect of liability unless the Complaint alleges with particularity that they breached the duty of loyalty by acting in bad faith in connection with the NetSuite transaction. The duty of loyalty requires directors to put the best interests of the corporation ahead of any other interest held by the directors and not shared by the stockholders.[183] The requirement to act in good faith is a component of the duty of loyalty.[184] To state a claim for bad-faith conduct, a plaintiff must allege "either [1] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable

---

[182] Bingham left the Oracle Board before the Plaintiff's Complaint was filed. Compl. ¶ 27. Thus, his conduct is not relevant to the demand futility analysis. *See, e.g.*, *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *9 (Del. Ch. May 31, 2016) ("[W]hether demand is excused is typically analyzed with respect to the directors seated as of the date that the complaint was filed."), *aff'd*, 175 A.3d 621 (Table) (Del. 2017). Nonetheless, as discussed below, nothing about Bingham's conduct suggest a serious prospect of liability for acting disloyally toward Oracle.

[183] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[184] *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006).

judgment that it seems essentially inexplicable on any ground other than bad faith."[185] Our Supreme Court has identified three non-exhaustive examples of bad-faith conduct:

> [1] the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] the fiduciary acts with the intent to violate applicable positive law, or [3] the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[186]

Crucially, bad faith requires a showing that "the directors acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper."[187]

"[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[188] "As long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations."[189] Conscious disregard for fiduciary duties is not the only form bad faith can take; a lack of good faith may also be shown where a director intentionally pursues goals other than the best interests of the stockholders.[190] This species of bad faith can result from "'any emotion [that] may

---

[185] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (quoting *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016)).

[186] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

[187] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (internal quotation marks and citation omitted).

[188] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[189] *Chen v. Howard-Anderson*, 87 A.3d 648, 683 (Del. Ch. 2014).

[190] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 67.

cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation,' including greed, 'hatred, lust, envy, revenge, . . . shame or pride.'"[191] As then-Vice Chancellor Strine put it, "[t]he reason for the disloyalty (the faithlessness) is irrelevant[;] the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless."[192]

Here, the Plaintiff's best-case scenario for demand futility based on a substantial likelihood of liability runs as follows. Ellison was the largest stockholder of both Oracle and NetSuite. Ellison had for some time planned on having Oracle purchase NetSuite when such a deal suited his interests. Starting in 2015, NetSuite's prospects began to look bleak, in large part because of increasing competition from Oracle, which had started making inroads in the cloud-based ERP software space. Ellison thus faced a problem: if he sat by and allowed Oracle to continue outcompeting NetSuite, that might destroy the value he had built up there. Ellison's solution was to have Oracle buy NetSuite at an inflated price, thereby allowing him to monetize his investment before it lost significant value. Ellison directed Oracle

---

[191] *Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308, at *27 (Del. Ch. Apr. 14, 2017) (alterations in original) (quoting *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.)). This useful list of distractions from duty describes them as "emotions"; it seems, however, related to Pope Gregory's list of deadly *sins*. If so, it omits sloth and gluttony. Sloth, perhaps, is relegated to a distraction from the duty of *care*, and not loyalty. With respect to gluttony, I am not sufficiently disinterested to comment.
[192] *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

management—including Catz, his primary enforcer—to carry out his plan. Ellison told Catz to initiate price negotiations with NetSuite in the range of $100 to $125 per share, and Catz did as instructed. The Board was deliberately kept in the dark about these negotiations, though it did authorize Catz to float the idea of an acquisition with NetSuite's CEO.

The next step was the formation of the Special Committee, which was empowered to approve or reject an acquisition of NetSuite, and which received the Independence Committee's jurisdiction over conflicts of interest. Ellison instructed Catz to manipulate the Special Committee into agreeing to an acquisition of NetSuite at an inflated price. To that end, Catz fed Moelis, the Special Committee's financial advisor, inflated NetSuite projections that made an acquisition in Ellison's preferred range appear reasonable. Moelis, for its part, faced a conflict of interest stemming from its fee structure, which promised a $17 million payout if the NetSuite acquisition closed but only $1 million if the transaction did not happen and no fairness opinion was issued. The members of the Special Committee, and the other outside directors, failed to do enough to address the conflicts of interest inherent in a transaction with NetSuite. In the end, the Special Committee agreed to acquire NetSuite for $109, a price within the range initially chosen by Ellison.

Even assuming that this narrative is supported by well-pleaded facts, the Complaint as a whole fails to show that any of Oracle's eight outside directors face

a substantial likelihood of liability for breaching the duty of loyalty. First, the Plaintiff argues that the members of the Independence Committee—Bingham, Garcia-Molina, and Berg—should have acted as soon as the NetSuite acquisition was proposed to the Board to address the conflicts of interest presented by that transaction. As the Plaintiff points out, the Independence Committee's charter obligated it to "analyze and assess applicable potential conflicts of interests" and "[r]eview and approve all [i]nterested [t]ransactions."[193] It is true that the Independence Committee could have acted more swiftly to implement safeguards regarding the conflicts of interest inherent in an acquisition of NetSuite, taking action prior to the Board's delegation of its authority to the Special Committee. But that failure represents at most an exculpated breach of the duty of care.[194] The Complaint lacks particularized facts suggesting that the Independence Committee members intentionally ignored their fiduciary responsibilities, or that they deliberately took a lax attitude toward the potential conflicts of interest because they wished to please Ellison. For example, the Complaint does not allege that Bingham, Garcia-Molina, or Berg learned that Catz had engaged in unauthorized price negotiations with NetSuite's CEO and, rather than taking steps to remove Catz from

---

[193] DiTomo Aff. Ex. W, at 2.

[194] *See McPadden v. Sidhu*, 964 A.2d 1262, 1271–75 (Del. Ch. 2008) (holding that the directors breached the duty of care (but not the duty of loyalty) by allowing a conflicted CEO to run a sales process over which they exercised little to no oversight). I note that I have not found that even the duty of care is implicated by the allegations here.

the process, allowed her to continue negotiating with NetSuite. Absent that kind of allegation—which might suggest behavior "essentially inexplicable on any ground other than bad faith"[195]—the Plaintiff's challenge to the Independence Committee's conduct falls short of showing that its members face a substantial likelihood of liability.

Next, the Plaintiff offers several criticisms of the Special Committee's process. Before addressing the Plaintiff's arguments about the Special Committee, it is worth pausing to discuss the composition of the Committee, its powers, and the process it employed in evaluating the NetSuite transaction. The Special Committee consisted of Panetta, James, and Conrades, all of whom were outside directors of Oracle. It was given the power to approve or reject a transaction with NetSuite, negotiate terms with NetSuite, consider alternatives to acquiring NetSuite, and direct Oracle management's involvement in the negotiation process. The Special Committee appointed qualified and independent advisors to assist it in its deliberations, and it met thirteen times over several months to evaluate the potential acquisition. The Special Committee weighed the pros and cons of acquiring NetSuite, considered "other alternatives that may be available to [Oracle], including the prospects for organic growth and alternative acquisition candidates,"[196] and

---

[195] *In re MeadWestvaco S'holders Litig.*, 168 A.3d at 684 (quoting *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7).
[196] DiTomo Aff. Ex. H, at 2.

ultimately decided that acquiring NetSuite would help Oracle expand its presence in the increasingly important cloud-based ERP software space. While Oracle management presented to the Special Committee on several occasions, management was not involved in the Committee's deliberations, and Ellison did not attend any of its meetings. The Special Committee engaged in serious negotiations with NetSuite, at one point refusing to respond to NetSuite's counteroffer of $120 per share despite recognizing that NetSuite "may decide to terminate further discussions with the Special Committee."[197] In the end, the Special Committee agreed to acquire NetSuite for $109 per share, a price that Moelis deemed to be fair, from a financial point of view, to Oracle and its stockholders.

Our Supreme Court has made clear that "[i]n the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[198] As an initial matter, the process just described does not clear this bar. It does not bespeak a knowing and complete failure to comply with fiduciary responsibilities; nor does it suggest a desire to pursue some purpose other than that of advancing the best interests of Oracle.[199] Nevertheless, the Plaintiff takes issue with several aspects of

---

[197] DiTomo Aff. Ex. K, at 2.

[198] *Lyondell Chem. Co.*, 970 A.2d at 243 (second and third alterations in original) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654–55 (Del. Ch. 2008)).

[199] *See id.* at 243–44 ("[If] the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty."); *In re Walt Disney Co.*

38

the Special Committee's process. I discuss the Plaintiff's criticisms in detail below, but I note preliminarily that its objections to the process fail to show that the Committee's members face a substantial likelihood of liability for their role in the NetSuite acquisition.

The Plaintiff criticizes the Special Committee for failing to analyze alternatives to acquiring NetSuite. But the Committee's meeting minutes, which are incorporated into the Complaint, reflect that the Committee decided to pursue the NetSuite acquisition only after it had evaluated "other alternatives that may be available to [Oracle], including the prospects for organic growth and alternative acquisition candidates."[200] That evaluation was informed by presentations from Oracle management and Moelis, both of which discussed potential acquisition targets other than NetSuite.[201] For example, one of the companies Moelis discussed possessed a "[b]road suite of products for a wide range of industries but lack[ed] deep functionality."[202] Moreover, at the same meeting where it decided that it would pursue a transaction with NetSuite, the Special Committee also made clear that it "would remain open-minded about potential alternatives if they were to emerge."[203]

---

*Derivative Litig.*, 906 A.2d at 67 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . .").

[200] DiTomo Aff. Ex. H, at 2.

[201] Rohrer Aff. Ex. FF, at 25–26; Rohrer Aff. Ex. GG, at ORACLE00000713.

[202] Rohrer Aff. Ex. FF, at 26.

[203] DiTomo Aff. Ex. H, at 2.

The Plaintiff may be correct that the Special Committee should have undertaken a more rigorous analysis of alternatives. It does not follow, however, that the Committee's actual consideration of alternatives reasonably implies bad faith.[204]

The Plaintiff also charges the Special Committee with "act[ing] as if it had no reason to be on guard against the multi-billion dollar personal interest of Ellison in effecting a high-premium acquisition of NetSuite, or on guard against the lack of independence of the senior managers and their subordinates."[205] Yet the Complaint and the documents it incorporates by reference tell a different story. Ellison did not attend any of the Special Committee meetings, and while Catz and other members of Oracle management presented to the Committee on several occasions, they never participated in its deliberations. Further, setting aside her initial price discussions with NetSuite's CEO (which none of Oracle's outside directors knew about at the time), Catz did not negotiate with NetSuite. Even assuming that Catz attempted to manipulate the Special Committee into doing a deal that favored Ellison, nothing in the Complaint suggests that the Committee had any inkling of such misconduct. And, as this Court has recognized, even a conflicted CEO may be uniquely

---

[204] *See In re Affiliated Computer Servs., Inc. S'holders Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009) ("The business judgment rule . . . is not rebutted by Monday morning quarterbacking."); *see also In re Alloy, Inc.*, 2011 WL 4863716, at *8 (Del. Ch. Oct. 13, 2011) ("Plaintiffs' criticism of the Special Committee for not evaluating fully alternative transactions does not implicate director self-interest or lack of independence. Even if supported by well-pleaded facts, such a criticism would state at best a claim for breach of the duty of care.").
[205] Pl.'s Answering Br. 36.

40

positioned to help the directors carry out their duties in significant transactions.[206]

Thus, I cannot infer disloyalty or bad faith from the manner in which the Special Committee addressed the conflicts presented by the NetSuite transaction.

The Plaintiff identifies another purported defect in the Special Committee's process: Moelis's fee arrangement, which supposedly incentivized it to push for the NetSuite acquisition. As noted above, under that arrangement, Moelis would be paid $17 million if the transaction with NetSuite closed, but only $1 million if the Special Committee declined to do the deal and no fairness opinion was issued. The Plaintiff is correct that this Court has recognized the potential pitfalls of contingent fee arrangements, which "may incentivize advisors to prioritize the closing of the transaction over getting the best deal possible for stockholders."[207] But the Plaintiff has not cited any authority (and I am aware of none) for the proposition that bad faith may be inferred from a special committee's decision to compensate its financial advisor via a contingent fee arrangement.[208] And the Special Committee here did

---

[206] *See, e.g.*, *In re Plains Exploration & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *5 (Del. Ch. May 9, 2013) (noting that the board may reasonably have perceived a conflicted CEO as being in the best position to advance stockholders' interests).

[207] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *20 (Del. Ch. Dec. 11, 2017); *see also In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) ("Contingent fees are undoubtedly routine; they reduce the target's expense if a deal is not completed; perhaps, they properly incentivize the financial advisor to focus on the appropriate outcome. Here, however, the differential between compensation scenarios may fairly raise questions about the financial advisor's objectivity and self-interest.").

[208] Indeed, this Court has noted that "while stockholders may have sufficient concerns about contingent fee arrangements to warrant disclosure of such arrangements, that need to disclose does not imply that contingent fees necessarily produce specious fairness opinions." *In re Alloy, Inc.*, 2011 WL 4863716, at *11.

not blindly agree to pay a contingent fee; instead, it recognized that such an arrangement "would provide the financial advisor with a financial incentive to see a transaction completed[,] and discussed whether there were alternatives to the success fee structure that would best serve [Oracle] and its stockholders."[209]

Ultimately, the Special Committee decided that it would hire Moelis pursuant to the fee structure just described. It offered two reasons for doing so. First, it concluded that it would be unable to obtain high-quality financial advice unless it was "prepared to pay a fee in the range proposed by both Evercore[, the other financial advisor considered by the Committee,] and Moelis."[210] Second, it believed that "it would be more advantageous to [Oracle], on balance, were it not obligated to pay a significant fee for financial advisory services unless and until a transaction were completed."[211] One might legitimately take issue with these justifications. As the Plaintiff points out, Oracle's stockholders might be better off incurring a flat $17 million fee if that were the best way to ensure that the Special Committee received high-quality, unbiased advice regarding a multibillion dollar acquisition. But bad faith requires more than a showing of questionable judgment on the part of corporate fiduciaries; instead, it requires particularized facts suggesting that "the nature of the

---

[209] DiTomo Aff. Ex. F, at 2.
[210] *Id.*
[211] *Id.*

[directors'] action can in no way be understood as in the corporate interest."[212] Here, the only reasonable inference I can draw from the Special Committee's deliberations on this topic is that its members made a good-faith attempt to determine the appropriate fee arrangement for its financial advisor.[213]

The Plaintiff further details several purported defects in the valuations of NetSuite offered by Oracle management and Moelis. The Plaintiff focuses in particular on the two sets of valuation materials provided by Oracle management at the July 12 and July 13 Special Committee meetings. On July 12, Oracle management presented a DCF range of $93.78 to $120.83 per share; that range was calculated using the terminal value multiple method, and it incorporated additional due diligence Oracle management had conducted on NetSuite. Then, on July 13, that same DCF range was included as the "Conservative" case in management's latest valuation materials. Also included in those materials were two new valuation ranges: a "Base" case showing a valuation range of $110.63 to $141.96 per share, and an "Upside" case suggesting a range of $120.94 to $159.79. The Plaintiff accuses Catz of fabricating these valuation materials to induce the Special Committee to agree to acquire NetSuite. Even assuming that this allegation is well

---

[212] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1.
[213] Further evidence of the Special Committee's good faith in this regard is that it rejected a fee based on percentage of transaction value because such an arrangement "could be seen to provide a financial incentive for a higher deal price." DiTomo Aff. Ex. F, at 2.

43

pleaded, it fails to support an inference that the Special Committee acted in bad faith in relying on the valuation ranges presented to it, as opposed to itself falling victim to a fraud. Notably, the Complaint does not allege that the Committee's members knew that any of the valuation materials they reviewed were faulty. Perhaps the Special Committee should have been more skeptical about the information it was given, but any failure in that regard represents at best an exculpated breach of the duty of care.[214]

Finally, the Plaintiff does not even attempt to show that the outside Oracle directors who did not serve on either the Independence Committee or the Special Committee—Seligman, Boskin, and Chizen—face a substantial likelihood of liability in connection with the NetSuite acquisition. Thus, any argument to that effect is waived.[215] In all events, the Complaint lacks particularized factual allegations suggesting that Seligman, Boskin, or Chizen committed a non-

---

[214] *See DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *14 (Del. Ch. Sept. 30, 2013) ("In the absence of allegations that the Special Committee knew there were problems with the financial information Lichtenstein provided to them, their failure to question that information may have been negligent, but it did not rise to the level of bad faith."); *see also In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *12 (Del. Ch. Jan. 31, 2013) ("For purposes of stating a duty of loyalty claim, what the Defendant Directors *should have known* is substantively less culpable, for liability purposes, than what they *actually knew*. It is not inconceivable, or perhaps that unlikely, that a director, relying in good faith on an expert, could accept and rely upon a misguided assumption in the expert's financial analysis, without necessarily knowing of that error. So, even accepting that the 2.8% terminal rate was nonsensical, the Plaintiffs have only pleaded facts suggesting that the Board should have known that the rate was improper, not that they actually knew that it was. Accordingly, this alleged flaw in the fairness opinion does not raise an inference of bad faith.").

[215] *See In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) ("The Plaintiffs do not address these points in their Answering Brief, so I consider them waived.").

exculpated breach of duty, or indeed that these individuals played any role whatsoever in the NetSuite transaction.[216] Thus, because eight of the twelve Oracle directors who would be asked to consider a demand do not face a substantial likelihood of liability for their role in the NetSuite acquisition, demand is not futile on that basis.[217]

### 2. A Majority of the Oracle Board Lacks Independence

The Plaintiff also argues that demand is futile because a majority of the Oracle Board lacks independence from Ellison, who is plainly interested in the NetSuite acquisition. Delaware law is clear that directors are presumed to be independent for purposes of evaluating demand futility.[218] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[219] A plaintiff may establish that a director lacks independence by alleging with particularity that the director "is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine

---

[216] *See Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007) ("Generally speaking, a director who does not attend or participate in the board's deliberations or approval of a proposal will not be held liable.").

[217] In this section addressing the threat of director liability as excusing a derivative-plaintiff demand, I have purposely omitted discussion of potential director liability arising from involvement in a transaction in which the director is disinterested, but is not independent. As expressed below, I seek supplemental briefing on the issue of such liability, in the context of Rule 12(b)(6).

[218] *See Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004) (noting that in "the demand-excusal context, . . . the board is presumed to be independent").

[219] *Aronson*, 473 A.2d at 816, *overruled on other grounds by Brehm*, 746 A.2d 244.

45

the director's ability to judge the matter on its merits."[220]  Put differently, a director is not independent if particularized facts support an inference that she "would be more willing to risk . . . her reputation than risk the relationship with the interested [person]."[221]

"Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[222]   Nevertheless, "[s]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand."[223] In conducting the independence inquiry, I must "consider all the particularized facts pled by the plaintiff[] about the relationships between the director and the interested party in their totality and not in isolation from each other."[224]

The Oracle directors who would be asked to consider a demand are Ellison, Catz, Hurd, Henley, Berg, Boskin, Chizen, Conrades, Garcia-Molina, James, Panetta, and Seligman.  Ellison, of course, is conflicted because he stood on both

---

[220] *Frederick Hsu Living Trust*, 2017 WL 1437308, at *26.
[221] *Beam*, 845 A.2d at 1052.
[222] *Id.*
[223] *Id.*; *see also Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015) ("Close friendships [lasting fifty years] are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties.").
[224] *Sanchez*, 124 A.3d at 1019.

46

sides of the NetSuite acquisition; thus, he cannot impartially consider a demand.[225]

Catz, Hurd, and Henley are all senior Oracle officers who lack independence from Ellison. Even if he does not qualify as a controller (a question I need not decide here), Ellison owns a 28% stake in Oracle, the company he cofounded over forty years ago. Moreover, Ellison allegedly maintains a firm grip on Oracle's day-to-day operations, and he has shown a willingness to remove directors and officers who cross him. Thus, the Plaintiff has created reasonable doubt that Catz, Hurd, or Henley could bring their business judgment to bear in deciding whether to sue Ellison.[226] That leaves the outside directors: Berg, Boskin, Chizen, Conrades, Garcia-Molina, James, Panetta, and Seligman. Because the Plaintiff has cast reasonable doubt on the independence of at least Conrades, James, and Seligman, a majority of Oracle's twelve-person board could not impartially consider a demand. Thus, demand is excused.

---

[225] *Cumming v. Edens*, 2018 WL 992877, at *12 (Del. Ch. Feb. 20, 2018) ("The court will deem a director 'interested' for purposes of th[e demand futility] analysis when he stood on both sides of the transaction at issue or stood to receive a material benefit that was not to be received by others.").

[226] *See, e.g.*, *Mizel v. Connelly*, 1999 WL 550369, at *3 & n.1 (Del. Ch. July 22, 1999) (holding that two officers of a company could not impartially consider a demand to sue the company's 32.7% stockholder even though that stockholder might not qualify as a controller); *Steiner v. Meyerson*, 1995 WL 441999, at *9 (Del. Ch. July 19, 1995) (rejecting "the proposition that an officer of a corporation who is not alleged to be receiving any benefit from the challenged transaction may only be found to be interested or dependent, and therefore unable to impartially respond to a demand letter, if the corporation is controlled by a single shareholder," on the ground that "our law is . . . more realistic and less formal than that"); *see also In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *7 (Del. Ch. Oct. 21, 2011) ("It can be assumed that Blankfein and Cohn, as officials of Goldman, would be found to be interested or lack independence.").

### a. Conrades

The Plaintiff points to several allegations that bear on Conrades's independence. Conrades has held multiple high-level positions at Akamai Technologies Inc., and Oracle and Akamai have "made substantial purchases from each other."[227] Conrades is also a major investor in and director of MyTaskIt, a software startup.[228] MyTaskIt's Chief Technology Officer is Michael Russo, a Senior Director of Development at Oracle.[229] Russo needs Oracle management's approval to continue working at MyTaskIt.[230] Further, Conrades is Partner Emeritus at Polaris Venture Partners and Managing Partner at Longfellow Venture Partners; both are venture capital firms focused on areas in which Oracle is an active acquirer.[231] Polaris and Longfellow have portfolio companies that rely on Oracle technology or are managed by former Oracle executives.[232]

The Plaintiff also emphasizes Conrades's service on Oracle's Compensation Committee. The Complaint points out that at every annual stockholder meeting from 2012 to 2016, a majority of Oracle's stockholders rejected the company's executive pay practices.[233] What is more, in recent years, a majority of Oracle's non-Ellison

---

[227] Compl. ¶ 160.
[228] *Id.* ¶ 161.
[229] *Id.*
[230] *Id.*
[231] *Id.* ¶ 162.
[232] *Id.* ¶ 163.
[233] *Id.* ¶ 143.

stockholders have withheld votes for Compensation Committee members Conrades, Seligman, Chizen, and Bingham[234] in order to express disapproval of these directors' failure to address stockholder concerns about executive compensation.[235] For example, in 2013, approximately 60% of non-Ellison votes withheld support for Chizen, Conrades, and Seligman.[236] Thus, the only reason these directors have not been forced to resign is Ellison's continuing support.[237] According to the Plaintiff, that makes Conrades (and the other Compensation Committee members) beholden to Ellison.

Viewed in isolation, each entanglement of Conrades to Ellison is insufficient to imply lack of independence. Taken together, however, these allegations cast reasonable doubt on Conrades's ability to objectively evaluate a demand to sue Ellison. The Defendants are correct that, absent a showing of materiality, the threat of losing director fees is ordinarily not enough to impugn a director's independence.[238] It is also true that "a mere outside business relationship" between a director and an interested party is typically insufficient to create a disabling

---

[234] As noted above, Bingham had left Oracle's Board before the Complaint in this case was filed.

[235] *Id.* ¶ 145.

[236] *Id.*

[237] *Id.* ¶ 146.

[238] *See, e.g.*, *MCG Capital Corp v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ("There may be a reasonable doubt about a director's independence if his or her continued employment and compensation can be affected by the directors who received the challenged benefit. For director compensation to create independence problems, however, it must be shown that the compensation is material to the director." (footnotes omitted)).

49

conflict.[239] But in making an independence determination, I must "consider all the particularized facts pled by the plaintiff[] about the relationships between the director and the interested party in their totality and not in isolation from each other."[240]

Here, Conrades has multiple layers of business connections with Oracle: he is affiliated with two venture capital firms that operate in areas dominated by Oracle, he has an important role at a company whose CTO serves at Oracle's pleasure, and he has held high-level positions at another company that does substantial business with Oracle. True, the Complaint does not allege with particularity that these connections are significant to Conrades, and business relationships of this sort normally do not create a disabling conflict absent a showing of materiality.[241] But I cannot consider these ties between Conrades and Oracle in isolation; instead, I must view them in conjunction with the possibility that Conrades could lose his rather lucrative directorship—he received $468,645 in director fees in 2016[242]—if he agreed to sue Ellison. That possibility is not merely speculative. The Complaint

[239] *Beam*, 845 A.2d at 1050.
[240] *Sanchez*, 124 A.3d at 1019.
[241] *See, e.g.*, *Khanna v. McMinn*, 2006 WL 1388744, at *22 (Del. Ch. May 9, 2006) ("[T]he Plaintiffs make no allegations as to the terms of TelePacific's business dealings with Covad; nor do the Plaintiffs allege facts permitting the Court to infer, in this context, that TelePacific's relationship with Covad is material. Although the Plaintiffs have asserted that Covad received certain revenue from TelePacific in 2001 and 2002, this tells the Court little about the materiality of this relationship to TelePacific. As a consequence, without more, the Plaintiffs have failed to create a reasonable doubt as to the presumed disinterestedness and independence of Jalkut.").
[242] Compl. ¶ 19.

pleads that Ellison has displayed a willingness to remove directors who crossed him in the past, and it is reasonable to infer that Conrades would lose his board seat at the next annual stockholder meeting if Ellison decided to withhold support. In my view, the combined effect of Conrades's business ties and the threat of losing his directorship is to create reasonable doubt that he could impartially consider whether to sue Ellison.

### b. James

James, the chair of the Special Committee, is an Operating Executive at the Carlyle Group.[243] In that capacity, she serves on the boards of Veritas Holdings Ltd. and ION Investment Group Limited, two Carlyle portfolio companies.[244] Veritas specializes in information management, and Oracle is an important Veritas partner.[245] Indeed, in a 2017 interview, Veritas's CTO discussed "the 'very long future that the two companies have together on working on the problem of information management.'"[246] ION, a software conglomerate, has a business segment that is "a Gold level member of the Oracle Partner Network."[247] Catz publicly described James as a close friend at Oracle's 2014 OpenWorld conference.[248]

---

[243] *Id.* ¶ 150.
[244] *Id.*
[245] *Id.*
[246] *Id.*
[247] *Id.*
[248] *Id.* ¶ 148.

51

Until 2016, James served as Intel's President.[249] Since then, she has publicly stated that she is trying to become the CEO of another large technology company.[250] In a talk at Stanford, James described her approach to dealing with boards of directors: "When you're CEO, it's all about the board. If you have a dysfunctional board and a board that isn't supportive or that has [its] own internal dynamic and politics, life's too short for that."[251] In that same talk, James also said that "people do what they think the CEO wants, even if they know it's wrong. And that's a very dangerous phenomenon."[252] Moreover, in October 2017, the Oracle Board determined that James was no longer independent under the New York Stock Exchange's listing standards.[253] The reason: James had been appointed CEO of a joint venture between Oracle, Carlyle, and MACOM Technology Solutions Holdings, Inc.[254] Finally, like Conrades, James was serving on the Compensation Committee when the Complaint was filed; she received $548,005 in director fees in 2016.[255]

---

[249] *Id.* ¶ 149.
[250] *Id.*
[251] DiTomo Aff. Ex. Z (alteration in original).
[252] *Id.*
[253] Quinn Aff. Ex. 8.
[254] *Id.* I acknowledge that these developments postdate the filing of the Plaintiff's Complaint and thus do not bear on James's independence at the commencement of the litigation. I include these events only to give context to the Plaintiff's allegations.
[255] Compl. ¶¶ 20, 142.

Considered collectively, these allegations lead me to doubt that James could exercise independent business judgment in evaluating a demand to sue Ellison or Catz. James sits on the boards of two companies that have significant business relationships with Oracle. I agree with the Defendants that, standing alone, such ties do not create a disabling conflict.[256] But there is more. James has made clear her desire to head a major technology company. Given Oracle's prominence in the technology arena, it is reasonable to infer that James's career ambitions would weigh heavily on her if she were asked to consider suing Ellison, who continues to wield outsized influence at the company. James's remarks about the importance of a board that is "supportive" of a CEO cast further doubt on her independence. True, James also disapproved of blindly following a CEO's wishes, but the Plaintiff is entitled to a pleading-stage inference that James might be too deferential to either Ellison or Catz to bring her independent business judgment to bear in evaluating a demand. That is especially so in light of Catz's public statement that she is close friends with James.

Moreover, like Conrades, James would face the potential loss of her lucrative directorship if she agreed to sue Ellison. There are no allegations that the director

---

[256] *See, e.g.*, *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 ("The Plaintiffs fail to plead facts that show anything other than a series of market transactions occurred between ArcelorMittal and Goldman. For instance, the Plaintiffs have not alleged that ArcelorMittal is receiving a discounted interest rate on the loans from Goldman, that Mittal was unable to receive financing from any other lender, or that loans from Goldman compose a substantial part of ArcelorMittal's funding.").

compensation she receives from Oracle—$548,005 in 2016—is material to her. Even this lucrative compensation would form insufficient cause to doubt her impartiality.[257]  But I must consider the potential loss of director fees alongside the other allegations bearing on James's independence.[258]  The Plaintiff has alleged a constellation of facts that, taken together, create reasonable doubt about James's ability to objectively consider a demand.

### c. Seligman

According to the Plaintiff, Seligman is disabled from considering a demand because of a combination of business and personal ties between Seligman and Ellison.  First, the Plaintiff avers that Seligman and her husband's "life work" would be threatened if she agreed to sue Ellison.[259]  Seligman and her husband founded a private-sector think tank called the Research Board, and Ellison frequently attended and presented at Research Board events.[260]  After selling the Research Board in 1998, Seligman and her husband founded Ostriker von Simson, a technology consulting firm that heads the CIO Strategy Exchange ("CIOSE").[261]  CIOSE performs research on issues chosen by technology industry leaders; thus, CIOSE

---

[257] *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *15 (Del. Ch. Jan. 14, 2010) ("[D]irector compensation alone cannot create a reasonable basis to doubt a director's impartiality.").

[258] *See Sanchez*, 124 A.3d at 1022 ("[O]ur law requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence.").

[259] Compl. ¶ 152.

[260] *Id.* ¶ 153.

[261] *Id.* ¶¶ 153–54.

depends on these individuals' participation.[262] Ellison has attended and presented at CIOSE events, and the Plaintiff alleges that Ellison would stop doing so if Seligman voted to sue him.[263] Worse, according to the Plaintiff, other technology leaders would likely stop participating in CIOSE events if Seligman crossed Ellison.[264]

The Plaintiff highlights several other aspects of Ellison's relationship with Seligman. In 2010, Seligman's husband published a book that provides the following description of his first interaction with Ellison after Research Board was sold: "At the end [of an Ellison presentation], he spotted me and flashed a huge grin. Walking me, arm around my shoulder, to the side of the stage and away from his Gartner hosts, he said, 'I hope you really made them pay for the RB.' I was touched."[265] Ellison ended up writing a blurb for the book.[266] That book mentions that Seligman and her husband have known Ellison since the late 1980s and have had "numerous interactions over the subsequent years, including lunch at Ellison's Silicon Valley estate."[267] Moreover, Seligman and her husband own two condominiums on Lanai, a Hawaiian island in which Ellison owns a 98% stake.[268] Ellison also owns almost all of Lanai's businesses and infrastructure.[269] Finally, like

---

[262] *Id.* ¶ 154.
[263] *Id.*
[264] *Id.*
[265] *Id.* ¶ 153 (alteration in original).
[266] *Id.* ¶ 155.
[267] *Id.*
[268] *Id.* ¶ 156.
[269] *Id.*

Conrades and James, Seligman was a member of Oracle's Compensation Committee when the Complaint was filed, and she received $440,645 in compensation from the company in 2016.[270]

These allegations cast reasonable doubt on Seligman's independence. Seligman has several sources of conflicts: her business and personal relationships with Ellison, and her dependence on Ellison for her position on Oracle's board. Seligman and her husband founded a firm that heads CIOSE, an organization that relies on the participation of technology leaders such as Ellison. Indeed, Ellison has attended and presented at several CIOSE events. The Complaint supports a reasonable inference that Ellison would cease his involvement with CIOSE if Seligman decided to sue him. Perhaps Ellison's participation is not crucial to CIOSE's success, but the Plaintiff does not rely solely on Seligman's business ties in challenging her independence. Notably, Seligman and her husband have been friends with Ellison for about thirty years. The Complaint does not suggest that this friendship is particularly close or deep.[271] And, as the Defendants point out, Delaware law is clear that "mov[ing] in the same . . . social circles" is insufficient to create a disabling conflict.[272] But while Seligman and her husband do not appear to

---

[270] *Id.* ¶¶ 25, 142.

[271] *Cf. Sanchez*, 124 A.3d at 1022 ("Close friendships [lasting a half century] are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties.").

[272] *Beam*, 845 A.2d at 1051.

have an unusually strong friendship with Ellison, their relationship must be considered alongside Seligman's other ties to Oracle's founder. The Plaintiff has alleged with particularity that if Seligman agreed to sue Ellison, she would potentially jeopardize not only her decades-long friendship with Ellison, but also Ellison's willingness to shore up her consulting firm and ensure that she keeps her position on Oracle's board. That is enough to create reasonable doubt that Seligman could impartially consider a demand.

*B. Rule 12(b)(6)*

To sum up, I have found that demand is futile because the facts alleged raise a pleading-stage inference that a majority of the Oracle board—including two out of three members of the Special Committee that approved the acquisition—lacks independence. Thus, the Plaintiff has standing to bring this derivative suit on behalf of Oracle.

In addition to arguing that demand is not excused, however, the Defendants have moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim. "The standard under Rule 12(b)(6) is less stringent than that under Rule 23.1."[273] Thus, a complaint that withstands a Rule 23.1 motion "also will survive a 12(b)(6)

---

[273] *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *12 (Del. Ch. Oct. 28, 2013).

motion to dismiss, '*assuming that it otherwise contains sufficient facts to state a cognizable claim.*'[274]  When reviewing a Rule 12(b)(6) motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[275]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[276]

Oracle's charter contains a Section 102(b)(7) provision that exculpates its directors from liability for breaches of the duty of care.  "Thus, only claims that, as a matter of law, cannot be exculpated by that provision can survive the motion to dismiss."[277]  In *In re Cornerstone Therapeutics Inc. Stockholder Litigation*, our Supreme Court held that, regardless of the underlying standard of review,

> [w]hen a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.[278]

---

[274] *Id.* (emphasis added) (quoting *McPadden*, 964 A.2d at 1270).
[275] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).
[276] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).
[277] *Cumming*, 2018 WL 992877, at *25.
[278] 115 A.3d 1173, 1179–80 (Del. 2015).

The question, then, is whether the Plaintiff in this case has stated a non-exculpated fiduciary duty claim against each of the Defendants.

In my view, the Complaint supports a reasonable inference that Ellison and Catz acted disloyally in connection with the NetSuite acquisition. It is true that neither Ellison nor Catz voted to approve the transaction, but that alone does not mean the Complaint fails to plead non-exculpated claims against them. A corporate fiduciary who abstains from a vote on a transaction may nevertheless face liability if she "play[ed] a role in the negotiation, structuring, or approval of the proposal."[279] "Or a court might hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director was 'closely involved with the challenged [transaction] from the very beginning' and the transaction was rendered unfair 'based, in large part,' on the director's involvement."[280]

Here, the Complaint plausibly alleges that Ellison had a powerful motive for structuring an acquisition of NetSuite at an inflated price. Ellison had long considered having Oracle buy NetSuite. Yet the possibility of such a transaction was not seriously contemplated until early 2016, when Oracle was outcompeting NetSuite and thus eroding the value Ellison had built up there. It is reasonably conceivable that Ellison decided to solve this dilemma by having Oracle—the

---

[279] *Valeant Pharm. Int'l*, 921 A.2d at 753.
[280] *Frederick Hsu Living Trust*, 2017 WL 1437308, at *38 (alteration in original) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1166 n.202 (Del. Ch. 2006)).

company he cofounded and has always maintained a firm grip over—acquire NetSuite at an unjustifiably high price. That inference is strengthened by the manner in which the transaction was revealed to the Board. The idea was pitched to the directors at a two-day retreat held at Ellison's Porcupine Creek estate, and while Ellison did not participate in the discussions, they took place in his personal presence. The directors did not receive any written materials on the potential transaction at this meeting, and they did not discuss the genesis of the idea.

After the Board directed Catz and Hurd to reach out to NetSuite, Catz spoke with NetSuite's CEO, Zach Nelson. Catz ignored the Board's instruction not to discuss price with Nelson, proposing a range of $100 to $125 per share, which represented a 42% to 78% premium on NetSuite's trading price the day of the conversation. It is reasonably conceivable that Catz, who once said that she "came in with absolutely no agenda other than to help Larry,"[281] took this step at Ellison's direction. Catz also concealed her secret price discussions from the Board, and it is again reasonable to infer that she did so because Ellison told her to. Moreover, though she did not participate in its deliberations, Catz was heavily involved with the Special Committee, feeding it projections that the Complaint alleges were designed to make an acquisition in the $100 to $125 range appear reasonable. When

---

[281] Compl. ¶ 64.

the transaction closed in November 2016, Oracle paid $109 per share, a figure within the range secretly discussed by Catz and Nelson.

These allegations support a reasonable inference that Ellison planned the NetSuite acquisition to benefit himself at the expense of Oracle's other stockholders. Not only did he stand on both sides of the transaction; he also directed his chief lieutenant to manipulate the sale process so that he could monetize his investment in NetSuite before it lost much of its value. Ellison's plan succeeded, with Oracle acquiring NetSuite at a price within the range discussed by Catz and Nelson. While Ellison recused himself from the Special Committee's deliberations and the final vote on the transaction, that does not mean the Complaint fails to support a reasonable inference that he acted disloyally toward Oracle.[282] Thus, the Complaint states a claim for breach of the duty of loyalty against Ellison, and I decline to dismiss him from the litigation at this stage.[283]

---

[282] *See In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995) ("I agree that no *per se* rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction. One might, for example, imagine a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. As part of the conspiracy, those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability. In such circumstances it is highly unlikely that those directors' 'nonvote' would be accorded exculpatory significance."); *see also Frederick Hsu Living Trust*, 2017 WL 1437308, at *38 (holding that certain directors could be held liable despite abstaining from the formal votes because, among other things, it was reasonably conceivable that "they engaged in behind-the-scenes communications with their fellow directors . . . on critical matters").

[283] *See, e.g.*, *Cede & Co.*, 634 A.2d at 361 ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

The Complaint also supports a reasonable inference that Catz breached the duty of loyalty by carrying out Ellison's plan to have Oracle acquire NetSuite at an inflated price. Catz violated the Board's instruction not to discuss price with NetSuite's CEO, and she later concealed her secret negotiations from the other directors. Moreover, Catz allegedly attempted to manipulate the sale process to steer the Special Committee toward Ellison's preferred price range. These allegations state a claim for breach of the duty of loyalty against Catz, and I will not dismiss her from this action at the pleading stage.[284]

The more complicated question is whether the Complaint states non-exculpated claims against the other Defendants: Henley, Hurd, Berg, Bingham, Boskin, Chizen, Conrades, Garcia-Molina, James, Panetta, and Seligman. I have already held that Conrades, James, and Seligman lack independence for demand-futility purposes. For the same reasons, I also conclude that these three directors lacked independence with respect to the decision to approve the NetSuite acquisition.[285] Yet, as discussed above, the Plaintiff has failed to demonstrate that any of the outside directors, including Conrades, James, and Seligman, face a

---

[284] *See TVI Corp.*, 2013 WL 5809271, at *14 ("The duty of loyalty is a corporate fiduciary's duty scrupulously to put the interests of the corporation and its shareholders before his or her own.").

[285] *See id.* ("A director will be considered conflicted with respect to a board decision if (i) the director stands to receive a benefit that is not shared by the corporation's stockholders as a whole, or (ii) the director is controlled by or beholden to another party. This is coextensive with the test for interestedness and lack of independence under the first prong of *Aronson*." (footnotes omitted)).

substantial likelihood of liability for acting in bad faith.  Put differently, there is nothing about these directors' conduct that suggests a serious prospect of liability for acting disloyally toward Oracle.[286]  Indeed, even under the more lenient pleading standards of Rule 12(b)(6), that conduct does not give rise to a duty of loyalty claim.  Thus, the question is whether *Cornerstone* requires that these Defendants remain in the litigation simply because the Complaint adequately alleges that they lacked independence as to the NetSuite acquisition.

The same question arises for the other Defendants.  I have held that Henley and Hurd lack independence from Ellison for demand-futility purposes; in my view, they were also beholden to Ellison with respect to the challenged acquisition.[287]  Henley and Hurd, as officers, lack the benefit of the exculpation clause for actions taken in their executive capacity.[288]  Are the facts alleged enough to state a claim for breach of fiduciary duty, especially in light of the paucity of specific allegations

---

[286] That is, setting aside potential liability for approving a transaction involving a party from whom they lacked independence.

[287] Because a majority of the directors who approved the NetSuite acquisition (indeed, a majority of the full Board) lacked independence, the transaction is subject to entire fairness review.  *See Frederick Hsu Living Trust*, 2017 WL 1437308, at *26 ("If a director-by-director analysis leaves insufficient [independent, informed, and disinterested] directors to make up a board majority, then the court will review the board's decision for entire fairness.").

[288] *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.13 (3d ed. 2017) (noting that Section 102(b)(7) "does not apply to officers . . . except to the extent that one who is a director and an officer may be exempted from liability for his or her acts *qua* director. In the case of a director-officer, actions taken solely in his or her capacity as an officer cannot be exempted from liability" (footnote omitted)).

about Henley and Hurd's role in the transaction process?[289]  I have not analyzed the independence of the remaining outside directors—Berg, Bingham, Boskin, Chizen, Garcia-Molina, and Panetta—though I have concluded that none of them face a substantial likelihood of liability for acting in bad faith in connection with the challenged acquisition.  Moreover, their conduct fails to give rise to a claim for breach of the duty of loyalty under Rule 12(b)(6).  Assuming that I were to find that any of these directors lacked independence as to the NetSuite acquisition, would that alone be sufficient to keep them in this litigation under *Cornerstone*?

The parties' briefs do not address this issue; they focus instead on the Rule 23.1 analysis.  Thus, the parties are directed to submit supplemental briefing addressing the following question: Do *Cornerstone* and its progeny, including this Court's recent decision in *Cumming v. Edens*,[290] require that this Court deny a motion to dismiss brought by an exculpated director whose conduct fails to give rise to a claim for breach of the duty of loyalty, except insofar she lacked independence as to the challenged transaction?  The parties' briefing should also address whether the Complaint states a claim against Henley and Hurd in their executive capacities.

---

[289] For example, the Special Committee's minutes reflect that neither Henley nor Hurd attended any of its meetings.  DiTomo Aff. Exs. E–P.

[290] 2018 WL 992877 (Del. Ch. Feb. 20, 2018).

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to dismiss is denied in part. I reserve decision on the balance of the Motion pending supplemental briefing and argument. The parties should submit an appropriate form of order.